## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

DWIGHT ALSTON,

      Petitioner,

v.                                 Case No. 2:21-cv-2196-MSN-tmp

KEVIN GENOVESE,

      Respondent.

## ORDER OF DISMISSAL
## ORDER DENYING CERTIFICATE OF APPEALABILITY
## ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
## AND
## ORDER DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

      Before the Court are the *pro se* Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody ("§ 2254 Petition," ECF No. 1) filed by Petitioner Dwight Alston and Respondent's Answer to Petition for Writ of Habeas Corpus (ECF No. 21).  For the reasons stated below, the § 2254 Petition is **DISMISSED**.

## I.    STATE COURT PROCEEDINGS

      On March 2, 2015, a grand jury in Tipton County, Tennessee returned an indictment charging Petitioner with first-degree premeditated murder, employing a firearm during the commission of a dangerous felony, and possession of a deadly weapon with intent to employ related to the killing of Petitioner's wife, Johnnie Alston, on September 20, 2014.  (*See* ECF No. 14-1 at PageID 260-63.)  A jury trial was held on July 13-15, 2016.  (*See* ECF No. 14-2 at PageID 300.)

      The Tennessee Court of Criminal Appeals ("TCCA") summarized the evidence presented

at trial as follows:

> This case relates to the Appellant's shooting his wife, Johnnie Patricia Alston, on September 20, 2014. Michael Alston, the Appellant's and the victim's son, testified that he was born on November 4, 1993, and was twenty-two years old at the time of trial. In September 2014, he lived with his parents on Andy Drive in Drummonds, Tennessee. At some point, the Appellant had moved out of the house, but he moved back in about three months before the shooting.

> Michael testified that on the evening of Friday, September 19, his parents were at home arguing. His mother was dressed to go to a party, but the Appellant wanted "some family time" and did not want her to leave. The victim left in her blue Jaguar, and Michael went to his room to watch television. He fell asleep but was awakened by the garage door opening. He said that he knew the victim had returned home, that he heard his parents arguing in the garage, and that the Appellant sounded angry. Michael walked from his bedroom to the door that separated the house from the garage and looked through a window in the door. The Appellant was standing in front of the door, and the victim was standing in front of her car. Michael said that the victim "was begging him and stuff" and that the Appellant would not let the victim into the house. The Appellant kept pushing the victim backward toward the overhead garage door and kept telling Michael to "stay back."

> Michael testified that he saw the Appellant holding a shotgun and that the victim "fell to the ground on her knees and started begging and everything." The victim was crying and told the Appellant, "I'm sorry. I'll do anything. I'll do—I'll sign the papers." The Appellant told Michael, "[G]et back, [you] don't need to see this." Michael walked into the kitchen and heard a gunshot one to two minutes later. He said that he was scared, that he grabbed the cordless house telephone, and that he ran across the street and hid under a neighbor's vehicle. The Appellant came outside, and Michael crawled out from under the vehicle. He did not see the Appellant holding a gun and asked if the Appellant was okay, but the Appellant would not answer. The Appellant told Michael to call the police, got into the Appellant's Nissan, and drove away. Michael called 911.

> On cross-examination, Michael testified that his mother left about 9:00 p.m. on September 19 and that he and the Appellant watched wrestling on television in the living room. About 9:20 p.m., Michael went to his room and fell asleep. Sometime before 10:00 p.m., he heard the front door of the house open and close. He went into the living room and looked outside but did not see the Appellant. The Appellant's Nissan was still in the driveway.

> Michael acknowledged that he had been diagnosed with schizophrenia and said that he used to take [T]razodone and Risperdal because he spoke to the devil and heard demons talking to him. However, he stopped taking the medications because they gave him headaches. He acknowledged telling a police officer that he thought the Appellant had the gun just to scare the victim and that he did not think the Appellant

2

was going to shoot her.  He also acknowledged that the victim would come home sometimes at 2:00 or 3:00 a.m. and that one time, she did not come home until 6:00 or 7:00 a.m.  On redirect examination, Michael acknowledged that[,] despite his mental health issues, he could remember details of events.

Deputy Wesley Ballard of the Tipton County Sheriff's Office (TCSO) testified that in the early morning hours of September 20, 2014, he transported someone to jail and pulled into the sheriff's office to turn in the paperwork for the arrest.  While Deputy Ballard was sitting in his patrol car, the Appellant approached and said that "he was there to turn himself in, because he'd done something bad."  Deputy Ballard asked what the Appellant did, and the Appellant said he shot his wife.  Deputy Ballard checked the Appellant for weapons and found a .410 shotgun shell in the Appellant's front pants pocket.  The officer learned from dispatch that the police were looking for the Appellant and took him into custody.

Corporal Eddie Walker of the TCSO testified that on September 20, 2014, he responded to a domestic call with possible shots fired at a home on Andy Drive.  Michael Alston was standing on the road in front of the house and was pointing to the house.  Corporal Walker described Michael as "[u]pset, scared."  Corporal Walker and three other officers went into the home, and Corporal Walker immediately noticed a strong smell of gunpowder.  The officers went into the garage, and Corporal Walker saw the victim lying face-down beside the overhead garage door.  Blood was pooled around her face.  About thirty minutes later, Corporal Walker learned that a vehicle possibly related to the shooting was at a residence in Atoka, Tennessee.  He went to the home and found the Appellant's Nissan.  Two .410 shotguns shells were in the passenger seat, and one of the shells was expended.  The Appellant was not present.

Sergeant Sean Cullen of the TCSO testified that about 1:40 a.m. on September 20, 2014, he responded to the home on Andy Drive.  He entered the front door and "could smell the odor of a discharged firearm inside the residence."  The victim was lying on the garage floor and had a hole in the back of her head.  Blood was around her head, and Sergeant Cullen saw brain matter but no wadding from a shotgun shell.

Dorothy Bounds, the Appellant's sister, testified that in September 2014, the Appellant had a good job working as a supervisor at the Army Corps of Engineers in Memphis.  He and the victim had been married about 25 years.  However, they had separated for a while in 2013, and the Appellant had lived with Dorothy and her family in Atoka for a few months.  The Appellant told Dorothy that he was going to file for divorce, and Dorothy "thought it was best."

Dorothy testified that in 2014, the Appellant returned to live with the victim and their son on Andy Drive.  Dorothy told the Appellant not to go back, but the victim wanted the Appellant to come home.  Sometime after the Appellant returned, he told Dorothy that he was going to proceed with the divorce.  The Appellant was

unhappy because the victim never wanted to stay home. One time, the Appellant visited the victim's place of employment and saw a card to the victim from "a man friend." Dorothy said that the victim "would go out with her friends, partying and drinking" and that the Appellant was "under stress." The Appellant was hoping that the victim would agree to divide their property equally in the divorce so that he would not have to pay a lot of money to an attorney. However, in August or September 2014, the Appellant told Dorothy that the victim "wasn't going to sign."

Dorothy testified that about 1:00 or 1:30 a.m. on September 20, 2014, she and her husband were awakened by a knock on their front door. Dorothy's husband answered the door, and Dorothy got up to see who was there. The Appellant was standing in the foyer, and Dorothy did not see any blood on him. The Appellant was shaking and nervous and told Dorothy that he had come to say goodbye because he had killed the victim and was going to jail. Dorothy said she started crying and screaming and fell to the floor. The Appellant wanted Dorothy's husband to help him turn himself in to the police, so Dorothy's husband left with the Appellant in Dorothy's vehicle. About 2:00 or 2:30 a.m., law enforcement arrived and impounded the Appellant's Nissan.

On cross-examination, Dorothy testified that the Appellant and his son, Michael, were close. Michael had mental health issues, and the Appellant and Michael were together all the time because the victim was "mostly not home." Dorothy said that the victim was still going to church but "kept living the other lifestyle." Dorothy acknowledged that the Appellant did not want to pay $10,000 to $15,000 for a contested divorce and that he stayed with the victim to try to work out their marriage. She said that when the Appellant came to her house on September 20, he "seemed like a zombie."

Mose Bounds, Jr., Dorothy Bounds's husband, testified that he and Dorothy had been married forty-two years and that he had known the Appellant about forty-three years. The Appellant lived at the Bounds home for a period of time, but Mose never talked with the Appellant about the Appellant's marriage. At some point, the Appellant and the victim reconciled. Mose said that after the reconciliation, the Appellant "acted kind of disturbed some, you know, like depressed."

Mose testified that about 1:15 a.m. on September 20, 2014, the Appellant knocked on the front door. The Appellant told Mose to take him to the Tipton County Jail "because he had done something he shouldn't have done." The Appellant also told Dorothy to give him a hug because she would not see him anymore. Mose said the Appellant was "[i]n a state of shock" and that he drove the Appellant to the sheriff's office. Mose said that the Appellant did not tell him specifically what the Appellant had done but "[i]n my mind, I knew about what he had done." He said that when they arrived at the sheriff's office, the Appellant talked with an officer, and the officer took the Appellant into custody.

Dr. Paul Benson testified as an expert in forensic pathology that he performed the

victim's autopsy.  The victim was fifty-one years old; five feet, nine inches tall; and wearing a "CC Blues Club" wristband.  She had a shotgun wound in the back of her head on the right side, and the wound caused "lethal injuries to her skull and brain."  Specifically, the victim experienced "diffused skull fractures, subdermal hemorrhage, which is bleeding that happens on top of the brain, and pulpification of the brain, which means that the brain tissue is just destroyed."  The trajectory of the gunshot was right to left, back to front, and slightly downward.  Dr. Benson recovered multiple birdshot pellets and "a three petal plastic shot wad" from the victim's head.  The gunshot entrance wound was circular and one-half inch in diameter, which was consistent with a .410 shotgun.  Dr. Benson did not see any soot or searing around the wound and estimated that the muzzle of the gun was about three feet from the victim when the gun was fired.  Toxicology tests did not show any drugs or alcohol in the victim's bloodstream.  He said that the victim's cause of death was a shotgun wound to the head and that the manner of death was homicide.

On cross-examination, Dr. Benson acknowledged that "homicide" was a medical, not legal, term and that it meant "death caused by another."  He said he could not determine the position of the victim's body at the time of the shooting.

Special Agent Mark Reynolds of the Tennessee Bureau of Investigation (TBI) testified that he went to the home on Andy Drive on September 20, 2014, to investigate the shooting, and he identified a diagram of the home's garage for the jury.  Looking into the garage from the driveway, a Mercedes was parked on the left, and a Jaguar was parked on the right.  The victim was lying behind the cars but in front of the large garage door.  Agent Reynolds found a single-shot, .410 bolt action shotgun "propped up in the corner" of a closet in the garage.  The victim was an employee on the naval base in Millington, and Agent Reynolds went there and photographed her office cubicle.  He said that a greeting card was in the cubicle and that someone had written in the card, " 'May God continue to bless and keep you, love you.'" The card was signed, "Joseph."

Barbara Thomas testified that she met the Appellant through her cousin in January 2014 and that they dated for a few months.  The Appellant and the victim were separated, and the Appellant was living with his sister.  Thomas said that the Appellant's divorce from the victim "was in motion" and that she and the Appellant talked about getting married.  The Appellant told Thomas that the victim was not contesting the divorce but that she "didn't want to sign the papers."  He also told Thomas that the victim was "going to sign one way or the other" and that "I can get a divorce one way or the other."  The Appellant thought their property would be "split down the middle," but he was concerned about their house and furniture.  At some point, the Appellant broke up with Thomas by texting her that he had decided to reconcile with the victim.

Special Agent Chuck Baker of the TBI testified that he interviewed the Appellant at the sheriff's office on September 20, 2014.  The interview was video-recorded,

and the State played the recording for the jury. During the interview, the Appellant stated as follows: He and the victim were "getting ready to go through a divorce," and he had "just been constantly at her about coming home at 1 or 2 in the morning." On the night of September 19, 2014, the victim left their house. The Appellant left soon after and "followed her up to the store. " He returned home, and he and his son watched television together. The victim returned home about 2:00 a.m. The gun was "right there in the closet." The Appellant picked it up and asked the victim "about this other guy." Their son came to the door while they were arguing, and the Appellant told him to go back inside the house. The victim was "pushing" the Appellant, and he "kept backing up." When he got to the rear of the car, he "bumped" the car, and his hand "hit the trigger." The gun was not pointed at the victim, and he did not know he had shot her. He looked down and saw blood. The Appellant returned to the closet and put another shell in the gun and a second shell in his pocket. He was going to shoot himself but heard his son calling and went outside. Agent Baker asked if the gun had "a safety," and the Appellant said yes. On cross-examination, Agent Baker acknowledged that the Appellant said throughout the interview that he did not intend to kill the victim.

Oberia Malone, the victim's sister, testified that the victim was a financial analyst at Navy Personnel Command. Malone worked in the same building as the victim, and they often had lunch together. One day, the Appellant "showed up" where they were eating lunch. The Appellant was quiet, did not eat with them, and did not interact with the victim.

Malone testified that on the Sunday before the victim's death, she went to the victim's home for Sunday dinner. After dinner, the victim went upstairs and "proceeded to separate items." Malone said that the victim was "torn" about divorcing the Appellant but that the victim was "tired of the situation." Malone stated that she and the victim often went out together at night. The victim would drink alcohol and dance, but Malone did not see the victim with other men. When the Appellant moved back home with the victim in 2014, he bought a Mercedes and tried to give it to the victim. However, the victim had her own car.

At the conclusion of Malone's testimony, the State rested its case.

*See State v. Alston*, No. W2017-00184-CCA-R3-CD, 2018 WL 801538, at *1–4 (Tenn. Crim. App. Feb. 8, 2018) (footnote omitted), *perm. app. denied* (Tenn. Apr. 23, 2018) (ECF No. 14-11).

Petitioner retained and was represented by Leslie Ballin at trial. On July 15, 2016, the jury found Petitioner guilty of murder in the first degree, and Petitioner was sentenced to life in prison. (ECF No. 14-1 at PageID 271–74, 286.) The charges for employing a firearm and possession of a deadly weapon were dismissed. (*Id.* at PageID 272–73.)

Petitioner appealed.  (*Id.* at PageID 294; *see* ECF No. 14-5.)  He raised one issue:  whether there was sufficient evidence to sustain the first-degree murder conviction.  (*See* ECF No. 14-7 at PageID 836.)  Petitioner was represented by Melissa Downing.  (*See* ECF No. 14-9 at PageID 891.)  On February 8, 2018, the TCCA affirmed.  (*Id.* at PageID 891, 899.)  On April 23, 2018, the Tennessee Supreme Court ("TSC") denied permission to appeal.  (ECF No. 14-11.)

On May 7, 2018, Petitioner filed a petition for post-conviction relief.  (ECF No. 14-3 at PageID 1015–30.)  The TCCA summarized the evidence presented at the post-conviction hearing as follows:

> The Petitioner testified that trial counsel failed to present an accidental killing defense.  He believed that if trial counsel had focused more on the accidental nature of the killing, he would likely have a received a conviction of second degree murder or manslaughter instead of first degree murder.  The Petitioner stated that if he had testified, he could have explained to the jury that the shooting was accidental.  He recalled having a conversation with trial counsel during the trial regarding whether he would testify, and trial counsel advised the Petitioner that it would not be in his best interest to testify.
>
> On cross-examination, the Petitioner acknowledged that he hired trial counsel to represent him.  The State pointed out that in the petition, the Petitioner alleged that he spoke with trial counsel about whether he would testify approximately a year prior to trial, even though the Petitioner had just testified that trial counsel only spoke with him about whether the Petitioner would testify the day of trial.  The Petitioner acknowledged trial counsel reviewed the evidence with him prior to trial.
>
> The Petitioner testified that he believed that trial counsel should have challenged Mr. Alston's competency to testify.  The Petitioner thought that Mr. Alston's testimony unfavorably impacted the outcome of the trial.  The Petitioner testified that Mr. Alston was a diagnosed schizophrenic who had been hospitalized prior to the shooting.  The Petitioner agreed that Mr. Alston suffered from hallucinations.  On cross-examination, the Petitioner acknowledged that trial counsel questioned Mr. Alston about his mental health on cross-examination at trial.
>
> After the Petitioner was convicted, trial counsel filed a motion for new trial raising twelve issues.  The Petitioner was appointed a separate attorney for the purpose of filing his direct appeal.  The Petitioner testified that appellate counsel only challenged the sufficiency of the evidence on appeal and did not raise any of the additional eleven issues that trial counsel raised in the motion for new trial.  The Petitioner said that he met with appellate counsel prior to her filing the appellate

7

brief and that she informed him that it was in his best interest to only challenge the sufficiency of the evidence. The Petitioner stated that he simply listened to appellate counsel's advice. On cross-examination, the Petitioner agreed that he had the opportunity to discuss which issues would be raised on appeal with appellate counsel but testified that he wanted appellate counsel to raise all of the claims that trial counsel included in the motion for new trial on appeal.

Trial counsel testified that he had practiced law for over forty-two years at the time of the post-conviction hearing. He recalled attempting to negotiate with the State for a plea to a lesser included offense but was unable to do so. Trial counsel remembered advising the Petitioner not to testify at trial and recalled having several discussions with the Petitioner about whether he should testify. Trial counsel agreed that the Petitioner came across as very mild-mannered and polite, and trial counsel was not concerned with the Petitioner's demeanor when he advised him not to testify. He was concerned with the issues that would be brought out during cross-examination, mainly that the Petitioner and the victim were going through a divorce, that they had argued about the division of personal property, and that the Petitioner believed that the victim had relationships with other men. Trial counsel believed that those issues could be used to establish a motive for first degree murder. Additionally, he explained that he believed that it was not necessary for the Petitioner to testify because the jury heard his recorded statement in which he maintained that the shooting had been an accident. Trial counsel recalled engaging in a mock examination with the Petitioner with trial counsel performing the role of the prosecutor. Trial counsel stated that he believed there "were areas of concern of questions that [the Petitioner] could not give a good answer to."

Regarding Mr. Alston's competency, trial counsel recalled speaking with Mr. Alston prior to trial. Trial counsel was aware of Mr. Alston's mental health diagnosis and was in possession of some of Mr. Alston's mental health records. Trial counsel was not concerned with Mr. Alston's competency to testify and stated that he did not believe that Mr. Alston "would have a problem understanding the importance of taking an oath to tell the truth." Trial counsel did not believe based on his conversation with Mr. Alston and Mr. Alston's medical records that there were grounds to challenge Mr. Alston's competency.

Trial counsel agreed that each of the twelve issues he raised in the motion for new trial had merit and should have been raised on appeal. He explained that it is his practice to prepare a motion of new trial immediately after trial while "the issues are fresh on my mind."

*See Alston v. State*, No. W2019-00930-CCA-R3-PC, 2020 WL 3639101, at *4–5 (Tenn. Crim.

App. July 2, 2020) (ECF No. 14-19), *perm. app. denied* (Tenn. Nov. 14, 2021) (ECF No. 14-23).

On March 19, 2019, the post-conviction court denied relief. (ECF No. 14-13 at PageID 1043–52.) Petitioner appealed. (*Id.* at PageID 1053.) He was represented by Frank Deslauriers on appeal. (ECF No. 14-17 at PageID 1106.) Petitioner raised claims of ineffective assistance of trial counsel for advising Petitioner not to testify at trial and for failing to investigate and raise issues of Michael Alston's competence and of trial court error concerning the denial of a continuation or bifurcation of the post-conviction hearing so that appellate counsel could testify. (ECF No. 14-17 at PageID 1110.) On July 2, 2020, the TCCA affirmed. *See Alston*, 2020 WL 3639101, at *1, 8. On January 14, 2021, the TSC denied permission to appeal. (ECF No. 14-23.)

## II.   FEDERAL HABEAS CLAIMS

Petitioner alleges the following grounds for relief:

1. Insufficient evidence to support first-degree premeditated murder (ECF No. 1 at PageID 5);

2. Ineffective assistance of trial, appellate, and post-conviction counsel (*id.* at PageID 7, 24–33, 45–47);

3. Trial court error (*id.* at PageID 8, 35–44);

4. Denial of the fundamental right to a fair trial based on the cumulative effect of errors (*id.* at PageID 10, 47).

## III.   LEGAL STANDARDS

Federal courts have authority to issue habeas corpus relief for persons in state custody under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

## A.      EXHAUSTION AND PROCEDURAL DEFAULT

A federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts pursuant to 28 U.S.C. § 2254(b) and (c).  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  The petitioner must "fairly present"[1] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, *O'Sullivan v. Boerckel*, 526 U.S. 838, 847–48 (1999).  Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court to "be deemed to have exhausted all available state remedies."  *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010).

The procedural default doctrine is ancillary to the exhaustion requirement.  *See Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine).  If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the procedural default doctrine ordinarily bars a petitioner from seeking federal habeas review of the claim.  *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the

---

[1] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted).  Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

federal question and adequate to support the judgment") (internal quotation marks and citation omitted)).[2]   In general, a federal court "may only treat a state court order as enforcing the procedural default rule when it unambiguously relied on that rule." *Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013).

If a petitioner's claim has been procedurally defaulted at the state level, the claim is barred unless the petitioner can show cause to excuse his failure to present the claim and actual prejudice stemming from the constitutional violation. *Schlup v. Delo*, 513 U.S. 298, 320–21 (1995); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  The only other way to excuse the procedural default is for a petitioner to make a credible claim of actual innocence.  A credible claim of innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Schlup*, 513 U.S. at 315 (quoting *Herrara v. Collins*, 506 U.S. 390, 404 (1993)).  "To pass through the gateway, a petitioner must produce new evidence that establishes a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Thornton v. Forshey*, No. 21-3012, 2021 WL 5276758, at *3 (6th Cir. Nov. 12, 2021) (quoting *Schlup*, 513 U.S. at 327) (cleaned up); *see also House v. Bell*, 547 U.S. 518, 536–39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

---

[2] The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits.  *Walker*, 562 U.S. at 315.  A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id*. at 316 (quoting *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009)).  "A discretionary state procedural rule . . . can serve as an adequate ground to bar federal habeas review . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others."  *Id*. (quoting *Kindler*, 558 U.S. at 54) (internal quotation marks and citations omitted).

**B.     MERITS REVIEW**

Pursuant to Section 2254(d), where a claim has been adjudicated in state courts on the

merits, a habeas petition should be granted only if resolution of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).  The petitioner carries the burden of proof on this "difficult to meet"

and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given

the benefit of the doubt."  *Cullen*, 563 U.S. at 181 (quoting *Harrington v. Richter*, 562 U.S. 86,

102 (2011), and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Review under § 2254(d)(1) is limited to the record before the state court that adjudicated

the claim on the merits.  *Cullen*, 563 U.S. at 182.  A state court's decision is "contrary" to federal

law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question

of law or "decides a case differently than" the Supreme Court has "on a set of materially

indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).  An "unreasonable

application" of federal law occurs when the state court "identifies the correct governing legal

principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts

of the prisoner's case."  *Id.* at 412–13.  The state court's application of clearly established federal

law must be "objectively unreasonable" for the writ to issue.  *Id*. at 409.  The writ may not issue

merely because the habeas court, "in its independent judgment," determines that the "state court

decision applied clearly established federal law erroneously or incorrectly."  *Renico v. Lett*, 559

U.S. 766, 773 (2010) (citing *Williams*, 529 U.S. at 411).

There is minimal case law addressing whether, under § 2254(d)(2), a decision was based

on "an unreasonable determination of the facts." In *Wood v. Allen*, 558 U.S. 290, 301 (2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion.[3] In *Rice v. Collins*, 546 U.S. 333 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination." *Rice*, 546 U.S. at 341–42.

The Sixth Circuit has described the § 2254(d)(2) standard as "demanding but not insatiable" and has emphasized that, pursuant to § 2254(e)(1), the state court factual determination is presumed to be correct absent clear and convincing evidence to the contrary. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010). A state court adjudication will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented during the state court proceeding. *Id.*; *see also Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011) (same).

## IV.  ANALYSIS

Respondent argues that Petitioner's claims are not cognizable, are unexhausted, or are meritless. (ECF No. 21 at PageID 1192.)

### A.  SUFFICIENCY OF THE EVIDENCE

In Ground One, Petitioner alleges that the State is required to prove all elements of an offense beyond a reasonable doubt and the State failed prove that Petitioner acted intentionally or that the killing was premeditated. (ECF No. 1 at PageID 5.) This claim was exhausted on direct

---

[3] In *Wood*, 558 U.S. at 299, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a petitioner must establish only that the state-court factual determination on which the decision was based was 'unreasonable,' or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence." The Court found it unnecessary to reach that issue, and left it open "for another day." *Id.* at 300–01, 303 (citing *Rice*, 546 U.S. at 339, in which the Court recognized that it is unsettled whether there are some factual disputes to which § 2254(e)(1) is inapplicable).

appeal.  The TCCA opined as follows:

> The Appellant contends that the evidence is insufficient to support the conviction because it fails to show he premeditated killing the victim.  The State argues that the evidence is sufficient.  We agree with the State.

> When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).  The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom.  *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).  Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact.  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).  This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury.  *Id*.  Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient.  *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

> A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.  *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998).  "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'"  *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).  "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'"  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009) ).

> First degree murder is the premeditated and intentional killing of another person.  Tenn. Code Ann. § 39–13–202(a)(1).  A premeditated killing is one "done after the exercise of reflection and judgment."  Tenn. Code Ann. § 39–13–202(d).  The element of premeditation is a question of fact for the jury.  *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003).  Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing.  *Bland*, 958 S.W.2d at 660.  In *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> > [D]eclarations by the defendant of an intent to kill, evidence of procurement

14

of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

The Appellant concedes that he shot and killed the victim but contends that he did not do so with premeditation. In support of his claim, he notes that his son did not hear him make any declaration to kill the victim before the shooting, that he told his son to call 911 after the shooting, that the State failed to reveal any facts to support a motive, that the killing did not involve particular cruelty, that he did not attempt to destroy evidence or hide the crime, that he was visibly upset when he spoke with his sister, and that he turned himself in to law enforcement.

Taken in the light most favorable to the State, the proof at trial showed that the Appellant and the victim were in the process of getting a divorce and that the Appellant was upset that the victim would not sign the divorce papers. He also was upset that she was staying out late at night and suspected she was seeing other men. The Appellant told Barbara Thomas that the victim was going to sign the papers and that he would get a divorce "one way or the other." On the night of September 19, 2014, the victim wanted to go to a party, but the Appellant did not want her to leave. She left anyway, and he followed her for a short time. When she returned home about 1:00 a.m., the Appellant confronted her in the garage, and they argued. The Appellant was angry. He got the .410 shotgun out of the garage closet, and he pointed it at the victim. The Appellant begged for her life and said she would sign the divorce papers. The Appellant knew Michael was looking through the door and told his son to get away because "[you] don't need to see this." The victim kept moving backward from the front of the cars to the rear of the cars, and the Appellant followed her. He shot her when she got to the garage door. He then put the shotgun back into the closet, told his son to call 911, and drove to his sister's house where he confessed to killing the victim.

The Appellant's procuring a weapon, using the deadly weapon on the unarmed victim, returning the weapon to the closet after the killing, and calmness immediately after the killing support a jury's finding of premeditation in this case. Moreover, his telling his son to get away because "[you] don't need to see this" shortly before the shooting could have been construed as a declaration to kill the victim. Finally, although the Appellant contends that the State failed to present proof of a motive, multiple witnesses testified that the Appellant was upset about the victim's partying and staying away from home, her possible involvement with other men, and her refusal to sign the papers for an uncontested divorce. In sum, the State presented numerous circumstances from which the jury could infer premeditation by the Appellant. Accordingly, the evidence is sufficient to support

the conviction.

*Alston*, 2018 WL 801538, at *4–6.

In *Jackson v. Virginia*, the Supreme Court held that, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief" if the Court finds, that "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." 443 U.S. 307, 324 (1979). This standard requires a federal district court to examine the evidence in the light most favorable to the State. *Id.* at 326 ("a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution").

A challenge to the sufficiency of evidence addresses whether "the government's case was so lacking that it should not have even been submitted to the jury." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (internal quotation marks omitted). "A reviewing court makes a limited inquiry tailored to ensure that a defendant receives the minimum that due process requires: a meaningful opportunity to defend against the charge against her and a jury finding of guilt beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 314–15) (cleaned up). The habeas court asks only "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original).

A federal habeas court may not intrude on the trier of fact's role "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* Sufficiency of the evidence claims "face a high bar in federal habeas proceedings

because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012). First, on direct appeal, the reviewing court defers to the trier of fact, and second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court." *Id.* (internal quotation marks omitted). The federal habeas court may overturn the state court's rejection of such a claim, only if the state court's decision was "objectively unreasonable." *Id.* (citation omitted); *see Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009) ("we are thus bound by two layers of deference to groups who might view facts differently than we would").

Respondent argues that the state court applied the governing standard in *Jackson* and that the state court decision is not contrary to or an unreasonable application of that standard. (ECF No. 21 at PageID 1213.) Respondent notes that weight and credibility determinations are for the jury and, based on the evidence, a reasonable jury could have found Petitioner guilty of first-degree murder. (*Id.* at PageID 1214.) Respondent asserts that "[a] fairminded jurist could conclude that a reasonable juror could find premeditation under this proof." (*Id.*)

On direct appeal, the TCCA cited and applied the correct Supreme Court precedent in *Jackson*, 443 U.S. 307. *See Alston*, 2018 WL 801538, at *4. The TCCA addressed the definition of first-degree premeditated murder and the evidence required to prove it. *Id.* at *5. The court noted that Petitioner conceded that he shot and killed his wife. *Id.* The TCCA explained that Petitioner's procurement of the weapon; using it against an unarmed victim; returning it to the closet; his "calmness immediately after the killing"; and the statement to his son that he should go away because "[you] don't need to see this" support a finding of premeditation and a declaration of Petitioner's intent to kill his wife. *Id.* at *6.

The evidence presented at trial permits a rational trier of fact to find Petitioner guilty of

premeditated first-degree murder.  This court, giving the deference due the TCCA, finds that the TCCA's determination that the State presented sufficient evidence to support Petitioner's first-degree murder conviction was not contrary to or an unreasonable application of the clearly established Supreme Court precedent in *Jackson*.  The TCCA did not base its decision on an unreasonable determination of the facts in light of the evidence presented.  Petitioner's sufficiency of the evidence claim is **DENIED**.

## B.      INEFFECTIVE ASSISTANCE OF COUNSEL

A claim that ineffective assistance of trial counsel has deprived a defendant of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To succeed on this claim, a movant must demonstrate two elements: (1) that counsel's performance was deficient, and (2) "that the deficient performance prejudiced the defense."  *Id*.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id*. at 686.

The Sixth Circuit opined that this standard is "even more difficult to meet in habeas cases, where the review that applies to *Strickland* claims is 'doubly deferential.'"  *Tackett v. Trierweiler*, 956 F.3d 358, 373 (6th Cir. 2020) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).  "The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold."  *Id*. (internal quotation marks and citation omitted).

To establish deficient performance, a person challenging a conviction "must show that counsel's representation fell below an objective standard of reasonableness."  *Id*. at 688.  A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's

representation was within the "wide range of reasonable professional assistance." *Id*. at 689.  The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.

To demonstrate prejudice, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome.  It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding.  Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Harrington*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 687, 693–94) (cleaned up); *see also Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out'" a more favorable outcome to prevail.  "Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

The deference accorded a state-court decision under 28 U.S.C. § 2254(d) is magnified when reviewing an ineffective assistance claim:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*., at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S., at 123, 129 S. Ct. at 1420 [(2009)].  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  556 U.S., at 123, 129 S. Ct. at 1420.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105.

A criminal defendant is entitled to the effective assistance of counsel on direct appeal.

*Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  The failure to raise a nonfrivolous issue on appeal does not constitute *per se* ineffective assistance of counsel, as "this process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (cleaned up).  Claims of ineffective assistance of appellate counsel are evaluated using the *Strickland* standards.  *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000) (applying *Strickland* to claim that appellate counsel rendered ineffective assistance by failing to file a merits brief); *Smith v. Murray*, 477 U.S. at 535–36 (failure to raise issue on appeal).  To establish that appellate counsel was ineffective, a prisoner

> must first show that his counsel was objectively unreasonable in failing to find arguable issues to appeal - that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them.  If [the prisoner] succeeds in such a showing, he then has the burden of demonstrating prejudice.  That is, he must show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal.

*Smith v. Robbins*, 528 U.S. at 285 (citation omitted).[4]

---

[4] The Sixth Circuit has identified the following nonexclusive list of factors to consider when assessing claims of ineffective assistance of appellate counsel:

1.    Were the omitted issues "significant and obvious?"
2.    Was there arguably contrary authority on the omitted issues?
3.    Were the omitted issues clearly stronger than those presented?
4.    Were the omitted issues objected to at trial?
5.    Were the trial court's rulings subject to deference on appeal?
6.    Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
7.    What was the appellate counsel's level of experience and expertise?
8.    Did the petitioner and appellate counsel meet and go over possible issues?
9.    Is there evidence that counsel reviewed all the facts?
10.   Were the omitted issues dealt with in other assignments of error?
11.   Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Franklin v. Anderson*, 434 F.3d 412, 429 (6th Cir. 2006) (citation omitted).

An appellate counsel's ability to choose those arguments that are more likely to succeed is "the hallmark of effective appellate advocacy." *See Smith v. Murray*, 477 U.S. 527, 536 (1986). It is difficult to show that appellate counsel was deficient for raising one issue, rather than another, on appeal. *See Franklin v. Anderson*, 434 F.3d 412, 429 (6th Cir. 2006). "In such cases, the petitioner must demonstrate that the issue not presented was clearly stronger than issues that counsel did present." *Id*. The petitioner must show that "there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004).

In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court recognized a narrow exception to the rule in *Coleman*, "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding . . . ." *Martinez*, 566 U.S. at 17. In such cases, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance [of counsel] at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id*. The Supreme Court emphasized that

> [t]he rule of *Coleman* governs in all but the limited circumstances recognized here . . . . It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons.

*Id*. The requirements that must be satisfied to excuse a procedural default under *Martinez* are:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (emphasis and alterations in original).

21

*Martinez* considered an Arizona law that did not permit ineffective assistance claims to be raised on direct appeal.  *Martinez*, 566 U.S. at 4.  In the Supreme Court's subsequent decision in *Trevino*, 569 U.S. at 429, the Court extended its holding in *Martinez* to states in which a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal . . . ."  *Trevino* thus modified the fourth *Martinez* requirement for overcoming a procedural default.  *Martinez* and *Trevino* apply to Tennessee prisoners.  *Sutton v. Carpenter*, 745 F.3d 787, 790 (6th Cir. 2014).  *Martinez* and *Trevino* do not, however, allow ineffective assistance of *post-conviction counsel* claims to serve as cause and prejudice for the procedural default of ineffective assistance of *appellate counsel* claims.  *Davila v. Davis*, 137 S. Ct. 2058 (2017).  Further, the Supreme Court has held that, "under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on the ineffective assistance of state post-conviction counsel."  *Shinn v. Ramirez*, 142 S. Ct. 1718, 1734 (2022).

### 1. Petitioner's Ineffective Assistance Claims

In Ground Two, Issues One through Three, of the Petition, Petitioner alleges multiple claims of ineffective assistance of trial, appellate, and post-conviction counsel.  In Issue One, Petitioner asserts that his trial counsel was ineffective for the following reasons:

1. Failing to present a defense including witness, ballistic or medical experts and evidence, and Petitioner at trial and to subject the prosecution's case to meaningful adversarial testing (Issue One, Claims One and Six, ECF No. 1 at PageID 24, 29, 45);

2. Advising Petitioner not to testify (Claim Two, *id*. at PageID 25);

3. Failing to request an instruction on accidental killing (Claim Three, *id.* at PageID 26); and

4. Failing to file a pretrial motion to exclude Michael Alston's testimony and to have a hearing a hearing to address his competency as a witness (Claim Four, *id.* at PageID 27); and

5. Ballin abandoning Petitioner without cause on his direct appeal.  (Claim Five, *id.* at PageID 28, 45).[5]

In Issue Two, Petitioner asserts that his appointed appellate counsel, Melissa Downing, was ineffective for failing to:

1. consult with Ballin on the twelve (12) issues he raised in the motion for new trial (Issue Two, Claim One, *id*. at PageID 30); and

2. investigate, raise, and preserve those issues on direct appeal.  (Claim Two, *id*. at PageID 31.)

In Issue Three, Petitioner asserts ineffective assistance of post-conviction counsel, Deslauriers, for failing to:

1. investigate and raise why Ballin failed to raise the motions for new trial issues and abandoned Petitioner on direct appeal (Claim One, *id.* at PageID 32); and

2. secure Downing as a witness at the post-conviction hearing.  (Claim Two, *id.* at PageID 33.)

Respondent argues that Petitioner is not entitled to relief on any of his claims of ineffective assistance of trial and appellate counsel because they are without merit or procedurally defaulted. (ECF No. 21 at PageID 1216–22.)  Respondent asserts that Petitioner's claims of ineffective assistance of post-conviction counsel are not cognizable in habeas.  (*Id.* at PageID 1223.)

### a.  The Exhausted Claims

On post-conviction appeal, the TCCA addressed: a) ineffective assistance of trial counsel for advising Petitioner not to testify and for failing to investigate and raise issues about his son's

---

[5] This is actually a claim of ineffective assistance of appellate counsel because it addresses Ballin's withdrawal on appeal.

competence; and b) ineffective assistance of appellate counsel for not raising issues from the motion for new trial.  *See Alston*, 2020 WL 3639101, at *1, 5, 8.

### 1)  Petitioner's Right to Testify

In Ground Two, Issue One, Claim Two of the habeas petition, Petitioner alleges that counsel's advice not to testify deprived the jury of crucial facts needed to establish a defense and reasonable doubt as to murder.  (ECF No. 1 at PageID 25.)  Petitioner asserts that the post-conviction court erred in finding that trial counsel's advice was "not ineffective."  (*Id.* at PageID 41.)

On post-conviction appeal, the TCCA opined as follows:

> The Petitioner maintains that trial counsel was ineffective for advising him not to testify.  The State argues that this argument is without merit because the Petitioner acknowledged that he made the decision not to testify after he and trial counsel discussed on multiple occasions the potential benefits and detriments of the Petitioner's testimony.

> During the post-conviction hearing, trial counsel stated that he advised the Petitioner not to testify because he was concerned that the State would question the Petitioner about his ongoing divorce with the victim.  Trial counsel also stated that the jury had already heard from the Petitioner when the State played the Petitioner's interview during Special Agent Baker's testimony.  The post-conviction court found that trial counsel "advised the Petitioner of the benefits and detriments of testifying and explained the decision was for the Petitioner to make."  The Petitioner testified in a jury-out hearing that he did not wish to testify before the jury and that it was his decision not to testify.  *See Momon*, 18 S.W.3d at 157. Further, the post-conviction court determined that the jury heard the Petitioner's version of the circumstances surrounding the shooting when the video recording of the Petitioner's interview with Special Agent Baker was played for the jury.  We conclude that trial counsel was not deficient for advising the Petitioner not to testify.  Because the Petitioner has failed to establish that trial counsel was deficient, we need not address the prejudice prong.  *See Kendrick*, 454 S.W.3d at 457.

*See Alston*, 2020 WL 3639101, at *6.

Respondent points to trial counsel's testimony at the post-conviction hearing explaining why he advised Petitioner not to testify, including the risks at cross-examination given the

Petitioner's marital distress and the fact that Petitioner claimed in his videotaped statement that the shooting was an accident:

> Part of the reasoning would have been based on the introduction into evidence [of] his statement. When trying a case when my client's statement is introduced, then it's no longer necessary for him to be subject to cross-examination to get his message across to the jury. That would have been one of the considerations. The others, I don't know at the time what they were. But sitting here today, I remember one of the reasons being that Agent Baker, if my memory is correct, testified about his statement that included that this was an accident.
>
> . . .
>
> It's what I was concerned about in as far as direct testimony, more important cross-examination, what it would bring out, issues in the divorce, fighting about personal property, issues at the trial as to whether or not she was out late at night carousing with other men. And how his initial statement that this was an accident could be stricken down by cross-examination to show an intentional killing, premeditated killing, which is what the State argued as a result of things that he would be asked about.
>
> . . .
>
> My recollection also is that in our pretrial conferences, we had mock trial question and answers where -- where I asked him questions as if he was on direct, and then portrayed the role of a prosecutor in asking him cross-examination-type questions. My recollection is that there were pitfalls. There were areas of concern of questions that he could not give a good answer to.

(ECF No. 14-14 at PageID 1092–93, 1095; *see* ECF No. 21 at PageID 1216–17.)

Respondent also pointed to the post-conviction court's written findings that

> It is not an attorney's job to advise the client to take the stand. Trial counsel should advise the client of the benefits and detriments of testifying and allow the client to make the decision. Mr. Ballin testified that he discussed with petitioner whether it would benefit him to take the stand, and they discussed the video statement would present his theory of the case. Mr. Ballin felt it would be in his interest to avoid cross-examination; but it was Mr. Alston's decision and not Mr. Ballin's decision.
>
> Trial counsel advised the Petitioner of the benefits and detriments of testifying and explained the decision was for the Petitioner to make. The Petitioner testified at a jury-out hearing that he did not want to testify before the jury, and that it was his decision.

The same information which the Petitioner would have presented to the jury if he had testified was already before the jury in his statement.

The interview was video-recorded, and the State played the recording for the jury. During the interview, the Appellant stated as follows: He and the victim were "getting ready to go through a divorce," and he had "just been constantly at her about coming home at 1 or 2 in the morning." On the night of September 19, 2014, the victim left their house. The Appellant left soon after and "followed her up to the store." He returned home, and he and his son watched television together. The victim returned home about 2:00 a.m. The gun was "right there in the closet." The Appellant picked it up and asked the victim "about this other guy." Their son came to the door while they were arguing, and the Appellant told him to go back inside the house. The victim was "pushing" the Appellant, and he "kept backing up." When he got to the rear of the car, he "bumped "the car, and his hand "hit the trigger." The gun was not pointed at the victim, and he did not know he had shot her. He looked down and saw blood. The Appellant returned to the closet and put another shell in the gun and a second shell in his pocket. He was going to shoot himself but heard his son calling and went outside. Agent Baker asked if the gun had "a safety," and the Appellant said yes. On cross-examination, Agent Baker acknowledged that the Appellant said throughout the interview that he did not intend to kill the victim.

Petitioner has failed to show how counsel was deficient in this regard. The jury heard the defendant/petitioner's version of what happened in the video. Petitioner got his version of the facts before the jury without being subjected to cross-examination. It was a trial decision for the defendant to elect not to testify. This issue has no merit.

(ECF No. 14-13 at PageID 1047–48; *see* ECF No. 21 at PageID 1217.)  Respondent argues that

the state court's decision on appeal was not contrary to or an unreasonable application of *Strickland*

and was based on a reasonable determination of facts in light of the evidence presented. (*Id.* at

PageID 1218.)

The TCCA found that Petitioner recalled speaking with trial counsel during trial about

whether he should testify and that Ballin advised Petitioner that it would not be in his best interest

to testify. *See  Alston,* 2020 WL 3639101, at *4. However, on cross-examination, Petitioner

admitted that, in his petition, he said he had spoken with trial counsel about whether to testify a

year before trial and acknowledged that trial counsel reviewed the evidence with him before trial.

*Id.* (*See* ECF No. 14-4 at PageID 1077–81.)  In Petitioner's post-conviction testimony, Petitioner claimed that, on the day of trial, Ballin "told me that he had to put me on and ask[ed] me did I want to take the stand, but I already knew not to take the stand." (*Id.* at PageID 1079–80.) Petitioner acknowledged that he and Ballin had discussed on multiple occasions whether he should testify, and Petitioner said he followed what Ballin told him to do. (*Id.* at PageID 1083.)

Ballin remembered several conversations with Petitioner about whether he should testify and Ballin's advice that Petitioner should not testify. *Id.* Ballin said that he told Petitioner "it's your decision not mine." (ECF No. 14-14 at PageID 1094.)  Ballin was not concerned with Petitioner's demeanor or the impression that he might give to the jury because Petitioner presented as mild-mannered, nice, and polite. (*Id.* at PageID 1092–94.)

The TCCA pointed out that, although Ballin was not concerned with Petitioner's demeanor at trial, he was concerned about the divorce, arguments over property, and Petitioner's concern over Johnnie Alston's relationships with other men. *Id.* The TCCA noted that Ballin believed that "those issues could be used to establish a motive for first-degree murder." *Id.* The TCCA credited Ballin's testimony, Petitioner's testimony in the *Momon* hearing (*see* ECF No. 14-4 at PageID 742–43), and found that the information about the circumstances of the shooting was before the jury. *Id.* at \*6. The TCCA held that trial counsel's performance was not deficient concerning the advice that Petitioner not testify. *Id.*

The TCCA cited and applied the correct standard in *Strickland. Id.* at \*6. Counsel's concerns about how a jury would view the couple's contentious divorce, relationship, and Petitioner's actions that night, including: a) his anger about his wife going out; b) following her when she left home; c) confronting her on her return hours later; and d) following her in the garage, despite her begging and agreeing to sign the divorce papers, raised legitimate concerns about

whether Petitioner would present well on cross-examination.  Counsel also informed Petitioner that it was his choice to testify.  The TCCA's determination that counsel's advice was reasonable and that his performance was not deficient is not contrary to or an unreasonable application of *Strickland* and is based on a reasonable determination of facts in light of the evidence presented. Petitioner's claim is without merit and **DENIED**.

### 2)  Michael Alston's Competency

In Ground Two, Issue One, Claim Four, Petitioner asserts his Sixth and Fourteenth Amendment rights were violated by counsel's failure to file a pretrial motion to exclude his son Michael Alston's testimony and seek a competency hearing.  (ECF No. 1 at PageID 27.)  Petitioner contends that Michael was diagnosed with schizophrenia and took Trazadone and Risperdal and that he stopped taking his medications against doctor's advice.  (*Id.*)  Petitioner asserts that "[t]his alone undermine[s Michael's] testimony."  (*Id.*)  Petitioner contends that the post-conviction court erred in finding that trial counsel was "not ineffective in failing to investigate and raising the issues" of Michael Alston's competence.  (*Id.* at PageID 42.)

On post-conviction appeal, the TCCA found that Petitioner's adult son, Michael, testified at trial that his mother wanted to go to a party and Petitioner wanted her to stay home.  *Alston,* 2020 WL 3639101, at *1.  Michael woke up when the garage door opened and heard his parents arguing.  *Id.*  Michael testified that he saw Petitioner holding a shotgun and his mother on her knees begging and saying that she would "sign the papers."  *Id.*  Michael said that Petitioner told him to "[G]et back, [you] don't need to see this."  *Id.*  When Michael returned to the kitchen, he heard gunshots moments later.  *Id.*

In the post-conviction proceedings, Petitioner testified that Michael suffered from hallucinations and had been hospitalized.  *Id.* at *4.  Petitioner believed that Michael's testimony

had an unfavorable impact on the trial.  *Id.*  However, Petitioner acknowledged that Ballin asked

Michael about his mental health on cross-examination.  *Id.*

Ballin was aware of Michael's diagnosis, had his mental health records, and had spoken to

Michael before the trial.  *Id.* at *5.  Ballin was not concerned about Michael's competency and

ability to take an oath and tell the truth.  *Id.*  Ballin found no basis in the medical records to

challenge Michael's competency.  *Id.*  On post-conviction appeal, the TCCA opined, as follows:

> The Petitioner contends that trial counsel was ineffective for failing to adequately
> investigate and challenge the competency of Mr. Alston to testify at trial.  The State
> maintains that the Petitioner has failed to establish that he was prejudiced by trial
> counsel's decision not to challenge Mr. Alston's competency to testify.  We agree
> with the State.
>
> Rule 601 of the Tennessee Rules of Evidence states that "[e]very person is
> presumed competent to be a witness except as otherwise provided in these rules or
> by statute."  The Advisory Comments to Rule 601 states that "[v]irtually all
> witnesses may be permitted to testify: children, mentally incompetent persons,
> convicted felons."  "[E]very witness shall be required to declare that the witness
> will testify truthfully by oath or affirmation, administered in a form calculated to
> awaken the witness's conscience and impress the witness's mind with the duty to
> do so."  Tenn. R. Evid. 603.  However, trial counsel "may attempt to impeach a
> witness by demonstrating his or her impaired capacity either at the time of the
> occurrence which is the subject of the testimony or at the time of the testimony."
> *State v. Garrick Graham*, No. E2014-01267-CCA-R3-CD, 2016 WL 892103, at
> *13 (Tenn. Crim. App. Mar. 8, 2016) (citing Tenn. R. Evid. 617; *State v. Barnes*,
> 703 S.W.2d 611, 617-18 (Tenn. 1985)).
>
> Trial counsel testified at the post-conviction hearing that he did not believe that Mr.
> Alston "would have a problem understanding the importance of taking an oath to
> tell the truth."  Further, trial counsel was aware of Mr. Alston's schizophrenia
> diagnosis and questioned him about his mental health on cross-examination.  Trial
> counsel also testified during the post-conviction hearing that he interviewed Mr.
> Alston prior to trial and had obtained his medical records.  During the cross-
> examination of Mr. Alston, trial counsel questioned Mr. Alston about his prescribed
> medications, the symptoms of his schizophrenia, and whether Mr. Alston was still
> taking his prescribed medications.  The Petitioner failed to present any evidence
> that Mr. Alston was not competent to testify at trial.  *See Larry E. Rathbone v. State*,
> No. E2019-00447-CCA-R3-PC, 2020 WL 2079264, at *13 (Tenn. Crim. App. Apr.
> 30, 2020) (concluding that the petitioner failed to show that trial counsel was
> ineffective for failing to challenge the victim's competency to testify when he failed
> to establish that "a factual basis existed for trial counsel to mount a successful

challenge to the victim's competency to testify."). Accordingly, we conclude that trial counsel was not ineffective for failing to challenge Mr. Alston's competence.

*Alston,* 2020 WL 3639101, at *7.

Respondent argues that the state court's decision was not contrary to or an unreasonable application of clearly established federal law and was not based on an unreasonable determination of facts in light of the evidence presented in the state court. (ECF No. 21 at PageID 1218, 1220.) Respondent asserts that Petitioner did not present proof that Michael was not competent to testify and failed to show that trial counsel was deficient for not having the testimony excluded. (*Id*. at PageID 1220.) Respondent points out that Ballin explored Michael's diagnosis and medications on cross-examination, and the jury made a credibility determination based on his testimony. (*Id.*)

At the post-conviction hearing, Petitioner acknowledged that Ballin cross-examined Michael at trial with his psychiatric history. (ECF No. 14-14 at PageID 1085.) Petitioner wanted to exclude his son's testimony. (*Id.* at PageID 1088.) However, Ballin testified that, after speaking with Michael and reviewing his records, he found no basis to file a motion based on Michael's competency. (*See* ECF No. 14-14 at PageID 1094–96.)

Michael testified about the argument before his mother left to go to a party, his father leaving the home, and what happened in the garage when his mother returned and tried to come in the house, her begging and crying, and his father pushing her away with the shotgun. (*See* ECF No. 14-3 at PageID 472–94, 516–17.) Michael testified that he left because "Daddy told me to get back, I don't need to see this." (*Id.* at PageID 494.) Michael was the only witness who could set the stage for the events that led to his mother's murder.

On cross-examination, Ballin asked Michael about his schizophrenia diagnosis and about the medications he was prescribed. (*Id.* at PageID 511.) Michael testified that he stopped taking Trazodone and Risperdal on his own because the medicine gave him headaches. (*Id.*) Michael

30

admitted that he was given the medication because he heard things—he talked to the devil and demons spoke to him.  (*Id.*)  Michael testified that the testimony he gave was true and he could remember details.  (*Id.* at PageID 520–21.)

Like with Tenn. R. Evid. 601, the Sixth Circuit has held that a mature person of normal appearance and demeanor is presumed to be a competent witness and that incompetency must be shown.  *Henderson v. United States*, 218 F.2d 14, 17–18 (6th Cir. 1955).  Further, the TCCA has clarified what it means to be competent to testify:

> "So long as a witness is of sufficient capacity to understand the obligation of an oath or affirmation, and some rule or statute does not provide otherwise, the witness is competent."  *Id.* at 538.  To understand the obligations of an oath, the witness must simply be aware of and sensitive to the obligation to tell the truth under oath. *See State v. Jackson,* 52 S.W.3d 661, 667 (Tenn. Crim. App. 2001).

*State v. Shellhouse*, No. E2001-01604-CCA-R3CD, 2002 WL 31202135, at *3 (Tenn. Crim. App. Oct. 3, 2002).  Michael's testimony demonstrates that he understood the oath and his obligation to tell the truth.

Petitioner has not pointed to any evidence to show that his son was incompetent to testify. Petitioner does not dispute any of Michael's testimony as untruthful or the product of his mental illness.  With no facts or evidence to show incompetence, Petitioner fails to meet his burden to show that his counsel's failure to challenge Michael's competence was deficient performance.

The TCCA's determination was not contrary to or an unreasonable application of *Strickland* and was based on a reasonable determination of facts in light of the evidence presented in the state courts.  Petitioner's claim of ineffective assistance about Michael's competence to testify is without merit and **DENIED**.

### 3)  Other Issues Raised on Appeal

On post-conviction appeal, Petitioner disagreed with the post-conviction court's finding

about ineffective assistance of appellate counsel because the case was not continued so appellate counsel could testify, and Petitioner suggested that the facts and Ballin's post-conviction testimony did not support the post-conviction court's findings. (*See* ECF No. 14-17 at PageID 1110, 1117–20.) At the post-conviction hearing, Petitioner said that Downing should have raised on appeal the twelve issues (*see* ECF No. 14-1 at PageID 287–88) that Ballin raised in the motion for new trial. (ECF No. 14-14 at PageID 1071–72.) However, Downing raised sufficiency of the evidence only. (*Id.*) Petitioner testified that Downing thought it was in Petitioner's best interest to raise only sufficiency of the evidence. (*Id.* at PageID 1072–73.) Petitioner later learned that this was not in his best interest and that "Ballin wouldn't have put that in there if it wasn't important." (*Id.*) Ballin testified that he raised "issues that I thought may be subject to relief before the Court of Criminal Appeals." (*Id.* at PageID 1097.) Neither Ballin nor Petitioner elaborated on the merits of any of the eleven claims from the motion for new trial that were not raised on appeal. [6]

The TCCA addressed Petitioner's assertions that appellate counsel was ineffective for failing to raise eleven issues presented in the motion for a new trial on appeal. *See Alston*, 2020 WL 3639101, at *8. This claim was raised in Ground Two, Issue Two, Claim Two of the § 2254 Petition. Respondent argues that the claim is procedurally defaulted because it was abandoned on post-conviction appeal and because the TCCA did not consider the claim. (ECF No. 21 at PageID 1222.) Because the record demonstrates that Petitioner exhausted the claim and the TCCA ruled on it, the Court will address this claim on the merits.

In the context of evaluating the post-conviction court's denial of a continuance, the TCCA opined as follows:

The Petitioner maintains that appellate counsel was ineffective for failing to raise

---

[6] Sufficiency of the evidence was raised in the motion for a new trial and on appeal. (*See* ECF No. 14-1 at PageID 287; *see* ECF No. 14-7 at PageID 836.)

on appeal eleven issues that were included in the motion for new trial. "Appellate counsel are not constitutionally required to raise every conceivable issue on appeal." *Carpenter v. State,* 126 S.W.3d 879, 887 (Tenn. 2004). When a petitioner bases his claim of ineffective assistance of counsel on counsel's failure to raise an issue on appeal, the petitioner proves deficient performance by showing that "this omission was so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Id.* "[I]f an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.* Similarly, a petitioner suffers no prejudice when appellate counsel fails to raise an issue on appeal, "unless the omitted issue has some merit." *Id.*

Here, in both the petition for post-conviction and the Petitioner's appellate brief, he simply lists the issues that he believes appellate counsel should have raised. The Petitioner failed to establish that any of these claims would have been successful on appeal. Accordingly, we conclude that the post-conviction court did not err in its findings.

*Alston*, 2020 WL 3639101, at *8.

Ballin withdrew the issue about the jury not being sworn because that was incorrect. (*See* ECF 14-1 at PageID 293.) The trial court denied the motion for a new trial. (*Id.*) Although both Petitioner and Ballin testified that they believed the claims in the motion for a new trial had merit, neither testified about why those claims would have been successful on appeal. Petitioner has failed to demonstrate deficient performance or prejudice.

The TCCA's decision was not contrary to or any unreasonable application of Supreme Court precedent and was not based on an unreasonable determination of facts in light of the evidence presented. Petitioner's claim of ineffective assistance of appellate counsel in Ground Two, Issue Two, Claim Two is without merit and **DENIED**.

### b. Procedurally Defaulted Claims

Respondent argues that the remaining ineffective assistance of trial counsel claims and the remaining claim of ineffective assistance of appellate counsel are procedurally defaulted. (ECF No. 21 at PageID 1220–22.)

### 1) Ballin's Withdrawal

Respondent argues that Ground Two, Issue One, Claim Five about trial counsel's withdrawal on appeal was not raised in the post-conviction petition or on appeal. (*Id.* at PageID 1222.) Respondent contends that this claim is procedurally defaulted because Petitioner has not fully exhausted his state court remedies. (*Id.*) Further, Respondent correctly asserts that *Martinez* does not excuse the procedural default because *Martinez* does not extend to claims of ineffective assistance of appellate counsel. (*Id.*) *See Davila*, 137 S. Ct. 2058.

Petitioner did not raise this claim in the state court proceedings. (*See* ECF No. 14-13 at PageID 107; *see also* ECF No. 14-17.) Petitioner has not demonstrated cause and prejudice or made a credible claim of actual innocence to overcome the procedural default. Ground Two, Issue One, Claim Five is procedurally defaulted and **DENIED**.

### 2) Remaining Defaulted Claims

Respondent argues that Ground Two, Issue One, Claims One, Three, and Six and Ground Two, Issue Two, Claim One[7] were raised in the post-conviction petition, but Petitioner abandoned those issues on appeal. (ECF No. 21 at PageID 1220–22.) Those claims are (i) ineffective assistance of trial counsel for failing to present a defense, including witnesses, ballistic or medical experts and evidence (*see* Ground Two, Issue One, Claims One and Six); (ii) ineffective assistance of trial counsel and for failing to request an instruction on accidental killing (*see id.*, Claim Three); and (iii) ineffective assistance of appellate counsel for failing to consult with Ballin about the issues in the motion for new trial (*see id.*, Issue Two, Claim One). (ECF No. 1 at PageID 24, 26,

---

[7] Respondent also argued that Ground Two, Issue Two, Claim Two was procedurally defaulted; however, as explained above, the Petitioner exhausted the claim and the TCCA ruled on it. This Court found that the claim was without merit. *See supra* Section IV.B.1.a(3), pp. 31–33.

29–30.)  Respondent argues that the claims were not fully exhausted to the highest available state court and are procedurally defaulted because *Martinez* has no application to a federal claim procedurally defaulted in collateral review appellate proceedings.  (*See* ECF No. 21 at PageID 1220–22.)

Petitioner did not exhaust these ineffective assistance of trial and appellate counsel claims on post-conviction appeal to the highest available state court.  Petitioner makes no argument to overcome the procedural default.  To the extent Petitioner may rely on *Martinez*, ineffective assistance of post-conviction counsel was not the cause for the default.  *See Martinez*, 566 U.S. at 17 (*Martinez* "does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial").  For these reasons, Ground Two, Issue One, Claims One, Three, and Six and Ground Two, Issue Two, Claim One are procedurally defaulted and **DENIED**.

In sum, Petitioner's claims of ineffective assistance of trial and appellate counsel in Ground Two, Issues One and Two, are without merit or procedurally defaulted and **DENIED**.

### c.  NON-COGNIZABLE CLAIMS

In Ground Two, Issue Three, Petitioner asserts ineffective assistance of post-conviction counsel, Deslauriers, for failing to investigate and raise Ballin's failure to raise the motion for new trial issues and his abandonment of Petitioner on direct appeal and for failing to secure appellate counsel, Downing, as a witness at the post-conviction hearing.  (ECF No. 1 at PageID 32–33.)  Respondent argues that these stand-alone claims are not cognizable in habeas.  (ECF No. 21 at PageID 1223.)

The ineffective assistance of post-conviction counsel does not constitute grounds for habeas relief.  *See* 28 U.S.C. § 2254(i).  Even if that were not the case, the Supreme Court has long

held that "[t]here is no right to counsel in state post-conviction proceedings" and therefore no right to effective post-conviction counsel. *Coleman*, 501 U.S. at 752 (citations omitted). *Martinez* and *Trevino* did not abrogate that rule. "Because there is no constitutional right to counsel in state postconviction proceedings, a prisoner ordinarily must bear responsibility for all attorney errors during those proceedings. Among those errors, a state prisoner is responsible for counsel's negligent failure to develop the state postconviction record." *Shinn v. Ramirez*, 212 L. Ed. 2d 713, 142 S. Ct. 1718, 1735 (2022) (cleaned up); *see Hugueley v. Mays*, 964 F.3d 489, 500 (6th Cir. 2020) ("Since a petitioner has no Sixth Amendment right to counsel in a post-conviction proceeding, it therefore follows that counsel cannot be ineffective for not taking all possible steps to fully develop the claim that the petitioner wishes she had"); *see Waterford v. Washburn*, 455 F. Supp. 3d 579, 608 (M.D. Tenn. 2020) (denying ineffective assistance of post-conviction claim as not cognizable). Because Petitioner has no constitutional right to the effective assistance of post-conviction counsel, his claims of ineffective assistance of post-conviction counsel in Ground Two, Issue Three, are not cognizable in this habeas proceeding and are **DENIED**.

### 2. TRIAL COURT ERRORS

In Ground Three, Petitioner alleges that the trial court erred when it:

1. Failed to swear in the jury (ECF No. 1 at PageID 35);

2. allowed Walker's testimony about Michael Alston's demeanor (*id.* at PageID 36);

3. allowed Cullen to testify as a ballistics expert (*id.* at PageID 37);

4. allowed Malone to testify about going to Petitioner's house to get furniture and the purpose of getting those items (*id.* at PageID 38);

5. allowed Malone to testify about the victim's demeanor and Petitioner's and the victim's marriage (*id.* at PageID 39);

6. allowed Ballin to withdraw after the trial (*id.* at PageID 40, 47);

7. determined, in the post-conviction proceedings, that trial counsel was not ineffective for advising Petitioner not to testify at trial and for failing to investigate issues of Michael Alston's competency (*id.* at PageID 41-42);[8] and

8. denied Petitioner a continuance or bifurcation of the hearing in the post-conviction proceedings so that Downing could testify (*id.* at PageID 43).

Respondent argues that Petitioner's claim of trial court error based on the post-conviction court's denial of a continuance is not cognizable and that the remaining claims of trial court error are procedurally defaulted. (ECF No. 21 at PageID 1223–29.)

### a. The Continuance

On post-conviction appeal, Petitioner asserts that he moved orally for a continuance of the post-conviction hearing to allow Downing to testify, but the motion was denied. (ECF No. 14-17 at PageID 1117.) Petitioner argues that the court erred by not allowing a resetting or a bifurcated hearing. (*Id.*) Petitioner contends that appellate counsel's absence from the hearing prevented the trial court from making proper factual findings. (*Id.*)

Respondent notes that Petitioner's claim that the trial court erred in the post-conviction proceedings by not granting a continuance or a bifurcated hearing to allow Downing to testify was reviewed on post-conviction appeal. (ECF No. 21 at PageID 1223.) Respondent argues that the claim was raised and addressed as a state law claim. (*Id.* at PageID 1224.) To the extent the claim could be considered a cognizable federal claim, Respondent argues that the TCCA's decision was not contrary to or an unreasonable application of clearly established federal law and was based on a reasonable determination of facts in light of the evidence presented. (*Id.*) Respondent contends

---

[8] In Ground Three, Claims Seven and Eight, Petitioner asserts trial court error from the post-conviction court's determination that trial counsel was not ineffective for advising Petitioner not to testify at trial and for and with regard to challenging Michael Alston's competence. (ECF No. 1 at PageID 42–43.) The Court has addressed these claims and found no error in the TCCA's rulings, *see supra* Section IV.B.1.a(1) & (2), pp. 23–31.

that the state court managed its docket appropriately, and there was no constitutional violation.

(*Id.*)

The TCCA opined as follows:

The State notes in its brief that the post-conviction court had previously granted the Petitioner two continuances and was acting within its discretion in denying another continuance.  We agree with the State.

Whether to allow a continuance is within the discretion of the post-conviction court. *See Terry D. Sneed v. State*, No. E2010-00323-CCA-R3-PC, 2011 WL 862029, at *3 (Tenn. Crim. App. Mar. 14, 2011) (citing *Moorehead v. State*, 409 S.W.2d 357, 358 (Tenn. 1966)).  The post-conviction court's decision to deny a request for a continuance will only be overturned when the post-conviction court abused its discretion and the petitioner was prejudiced by the court's decision.  *Dallas Jay Stewart v. State*, No. M2014-01682-CCAR3-PC, 2016 WL 2620286, at *4 (Tenn. Crim. App. May 5, 2016) (citing *State v. Morgan*, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991)).  "A Petitioner is improperly prejudiced by the denial of a motion for continuance when 'a different result might reasonably have been reached if the continuance had been granted.'" *Id.* (quoting *Morgan*, 825 S.W.2d at 117).

We conclude that the post-conviction court did not err by denying the Petitioner's oral motion for a continuance or a bifurcated hearing to allow appellate counsel to be present to testify.  The Petitioner's brief simply states that the post-conviction court erred in denying him a continuance because the post-conviction court made factual findings regarding the effectiveness of appellate counsel without listening to her testimony.  He failed to establish that he was prejudiced by the denial of a motion for continuance because he has not established that a different result would have occurred if the continuance was granted.  *Id.*  The Petitioner failed to present any evidence surrounding the circumstances of appellate counsel's absence from the hearing, and he failed to include any information regarding whether appellate counsel was under subpoena to testify at the post-conviction hearing.  The record establishes that the post-conviction court had granted two previous continuances.  The post-conviction court did not err in denying the Petitioner's request for a continuance.

*Alston*, 2020 WL 3639101, at *7–8.

To obtain habeas relief, Petitioner must assert a violation of the Constitution, laws, or treaties of the United States.  *See* 28 U.S.C. § 2254(a).  Petitioner's claim was raised and decided based on state law.  He cites to Tenn. Code Ann. § 40-30-111(b) in support of his argument.  (*See* ECF No. 14-17 at PageID 1117–18.)  Petitioner's challenge is to the state court collateral

proceeding and is not a constitutional challenge to his detention.  The claim is a matter of state law related to the post-conviction court's management of the case and does not raise a constitutional challenge.  *See Schlup v. Armontrout*, 941 F.2d 631, 642 (8th Cir. 1991) (the review in habeas of a claim that the post-conviction court denied a motion to continue the post-conviction hearing is not cognizable); *see Martin v. Evans*, 384 F.3d 848, 855 (7th Cir. 2004) ("The trial court's denial of a continuance, however, is a matter of state evidentiary law that does not provide a basis for federal habeas relief.")  Petitioner's claim that the post-conviction court erred in denying the motion for continuance is not cognizable and **DENIED**.

### b.  Defaulted Claims

Ground Three, Claims One through Five, were raised in the motion for a new trial, but they were not exhausted on direct appeal or post-conviction appeal.  (*See* ECF No. 21 at PageID 1226–29.)  These claims were not exhausted to the highest available state court and are procedurally defaulted.

Claim Six asserts trial court error for allowing Ballin, paid counsel, to withdraw on appeal. (ECF No. 1 at PageID 1229.)  This claim was not raised on direct appeal or in the post-conviction proceedings.  Petitioner has not exhausted this claim.

To the extent Petitioner relies on *Martinez* to overcome procedural default, his argument fails because these are not ineffective assistance of trial counsel claims.  *See Martinez*, 566 U.S. at 17.  Further, Petitioner has not otherwise demonstrated cause and prejudice nor a credible claim of actual innocence to overcome the procedural default.  Ground Three, Claims One through Six, are procedurally defaulted and **DENIED**.[9]

---

[9] Claim One is also without merit because the jury was sworn.  (*See* ECF No. 14-1 at PageID 293.)  Claims Two, Three, Four, and Five address state law evidentiary issues and do not rise to the level of a due process violation.  Generally, state evidentiary issues are not cognizable

Petitioner's claims of trial court error in Ground Three are without merit, not cognizable in habeas, or procedurally defaulted and **DENIED**.

### C.    CUMULATIVE ERROR

Petitioner alleges that the cumulative effect of the constitutional violations of ineffective assistance and trial court error denied Petitioner his fundamental right to a fair trial and effective appeal.  (ECF No. 1 at PageID 10, 47.)  The Sixth Circuit has held that "post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief."  *Hoffner v. Bradshaw*, 622 F.3d 487, 513 (6th Cir. 2010) (quoting *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)); *see Moreland v. Bradshaw*, 699 F.3d 908, 931 (6th Cir. 2012) (same); *see March v. McAllister*, 573 F. App'x 450, n.5 (6th Cir. 2014); *see also Cross v. Stovall*, 238 F. App'x 32, 41 (6th Cir. 2007) ("The law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue[,]") (quoting *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006)).  Petitioner's cumulative error claim is without merit and **DENIED**.

## V.   CONCLUSION

The issues raised in the § 2254 Petition lack merit, are non-cognizable, or are barred by procedural default.  The Court therefore **DISMISSES** the § 2254 Petition **WITH PREJUDICE**. The Court will enter judgment for Respondent.

## VI.   APPELLATE ISSUES

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003); *Bradley v. Birkett*, 156 F. App'x 771, 772 (6th Cir. 2005).  The Court must issue or deny a certificate of appealability ("COA") when it enters a

---

on federal habeas review.  *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

final order adverse to a § 2254 petitioner.  Habeas Rule 11.  A petitioner may not take an appeal unless a circuit or district judge issues a COA.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing.  28 U.S.C. §§ 2253(c)(2) & 3.  A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller-El*, 537 U.S. at 336 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same).

A COA does not require a showing that the appeal will succeed.  *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814–15 (6th Cir. 2011) (same).  Courts should not issue a COA as a matter of course.  *Bradley*, 156 F. App'x at 773 (quoting *Miller-El*, 537 U.S. at 337).

In this case, there can be no question that the claims in this Petition are without merit, procedurally defaulted, or not cognizable on habeas review.  Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court **DENIES** a certificate of appealability.

In this case for the reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith.  It is therefore **CERTIFIED**, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter would not be taken in good faith and leave to appeal *in forma pauperis* is **DENIED**.[10]

---

[10] If Petitioner files a notice of appeal, he must pay the full $605 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days of the date of entry of this order.  *See* Fed. R. App. P. 24(a)(5).

**IT IS SO ORDERED**, this 26th day of March, 2024.

*s/ Mark S. Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE